CLARENCE BARBER,                  )

                             )

               Plaintiff,       )

                             )

v.                              )

                             )

CITY OF CHARLOTTE, and      )

A.A. HOLDING, individually and officially,)

J.B WILSON, individually and officially,  )

D. MALONE, individually and officially,  )

RODNEY MONROE, officially,     )

                             )

               Defendants.    )

_____)

## PLAINTIFF'S TRIAL BRIEF

Now comes Plaintiff, through counsel, and files this Brief summarizing the issues for trial.

## BACKGROUND

Plaintiff filed this action *pro se* in 2010.  The undersigned appeared in the case and filed a Second Amended Complaint on January 20, 2012 alleging six claims – four state law claims for false arrest, assault, malicious prosecution and obstruction of justice, and two federal claims under the First and Fourth Amendments pursuant to 42 U.S.C. §1983.

## STATEMENT OF THE FACTS

Plaintiff, now 28, has lived at his parent's home at 416 Short Hills Drive in Charlotte all of his life, except for short stays with his grandmother, also in Charlotte, when he was a child. Plaintiff is African-American and Short Hills Drive is in heavily minority and economically distressed area off Nations Ford Road.   At age 14, Plaintiff got into legal trouble, disrupting his

schooling.   He has not had significant legal problems since, until he was charged with the felony

that is the subject of this lawsuit.  He obtained a general equivalency diploma and worked fairly

regularly, primarily in warehouse jobs driving a fork lift, until he was charged in this matter.

In November 2005, Plaintiff turned 21.  The next month, he obtained a gun permit from

the Mecklenburg County Sheriff and purchased a handgun.   Plaintiff has explained that he

carried the gun as a defensive measure, as he knew others who had been shot and killed.  Since

obtaining that first gun, he has never been accused or charged with using it in any aggressive or

offensive manner.

In December 2006, Plaintiff had the gun with him when police stopped the car he was

driving.   Police searched the car and found some marijuana and the handgun.   Plaintiff was

unfamiliar with the rules and did not have the gun out in plain view when the police stopped the

car, so he was charged with carrying a concealed weapon ("CCW").  At his first appearance, in

January 2007, he agreed *pro se* to accept a plea offer to dismiss the marijuana charge if he would

surrender the gun pursuant to the CCW.

Plaintiff had to wait a year to obtain a new gun permit, which he did in February 2008.

He then purchased a new handgun – the second and only other weapon he has ever owned.

Around Thanksgiving of 2008, while fueling his mother's car at a convenience store near his

home, Defendant Wilson approached Plaintiff and asked him about his gun, which Barber kept in

a holster on his hip in plain view.  Barber explained that he had a permit and the gun was

registered.  Defendant Holding claims that he ran the serial number for the gun that night and

confirmed that it was lawfully Plaintiff's.   Defendant Wilson also recalls seeing Plaintiff with

his holstered gun at the convenience store, though he did not approach Barber.

On December 6, 2008 near midnight, Plaintiff had just returned home and was standing in the driveway at 416 Short Hills Drive smoking a cigarette when Defendant Holding appeared in the darkness and demanded that Plaintiff show his hands and produce his gun. The dispatch record shows that Holding reported he had observed a suspected prowler just before approaching Plaintiff and demanding that he come to the street with his hands up. Defendant Wilson then came to the area to serve as back up. When he arrived, Holding had Barber in handcuffs at the front of Holding police car in the street.

Defendants Holding and Wilson were "rookie" police, literally in their first year on the force. They had met at the Charlotte-Mecklenburg Police Training Academy as cadets in November 2007 and graduated together in March 2008. *Holding Dep. p. 12, 15.* They were assigned to the third shift in Response Area 2 of the Steele Creek precinct, *Holding, p. 13,* which includes the area where Plaintiff lives. *Holding, pp. 20-21.* Wilson and Holding had become close, unsurprisingly. They worked side-by-side, riding together when access to individual police cars was limited, *Wilson, p. 8,* and they socialized outside of work. *Id. p. 37*

Both men knew who Plaintiff was, and recalled Wilson approaching Plaintiff in November 2008 near the intersection of Nations Ford and Arrowood because he had a handgun holstered on his waistband. *Wilson, p. 10; Plaintiff, p. 34, Holding, p. 47 and Dep. Ex. 2 (page 6 of 8, reference to 9001 Nations Ford in narrative).* Holding remembers approaching Plaintiff and asking about the gun, which Plaintiff explained it was duly registered. *Plaintiff, p. 35.* Holding did not specifically remember this encounter taking place at the convenience store, station, but agreed that it took place on Nations Ford Rd. and that he spoke with Plaintiff about his gun. *Holding pp. 19, 22-24, 47.* As mentioned above, Holding even claimed that he ran the gun's serial number that night and confirmed it was lawfully Barber's.

The police apparently viewed Plaintiff as a threat in the neighborhood, though he had not been charged with any serious offense in the prior 10 years. But he carried a gun openly and they knew of his 1998 robbery conviction when Plaintiff was 14.[1] *Plaintiff p. 21-22; Holding, p. 26-27.* Indeed, Wilson's training officer told Wilson about Plaintiff. *Wilson, p. 10.* Holding testified that he ran Plaintiff's criminal history after this November encounter and knew that history when he arrested Plaintiff on December 7, 2008. Holding also expressed surprise at deposition that Plaintiff was a juvenile at the time of that charge and that it dated that far back. *Holding, pp. 26-27.* Reputations can die hard.

On Saturday night, December 6, 2008, Plaintiff had been out driving his mother's 2007 Ford Freestyle. *Id. pp. 30-31.* On the way home, he stopped at that convenience store at Nations Ford and Arrowood where Wilson had approached him weeks before, and purchased a pack of cigarettes. *Id. p. 32.* Plaintiff then drove back to his house, backed the car into the driveway, got out and began to smoke a cigarette. He had taken his gun out of the car and laid it on the hood of another car in the drive way, parked next to the Freestyle. *Id. p. 33-34.*

Holding had seen and followed Plaintiff. He later claimed that he pursued Plaintiff for reckless driving, but it is undisputed that the "pursuit" was such that Plaintiff was able to back his car into the driveway before Holding approached. Plaintiff claims that Holding had followed stealthily, without any headlights, and stopped just up and across the street. That manner of approach would be consistent with Holding's report to dispatch that he was watching a prowler suspect on Short Hills Drive.

---

[1] One difficult evidentiary issue in this case is the admissibility of this prior conviction. It occurred more than 10 years ago, so it is subject to limits under Rule of Evidence 609(b), and it could be highly prejudicial to Plaintiff in the eyes of the jury. On the other hand, it appears to be one reason these officers were so suspicious of Plaintiff.

Holding got out of his car and directed Plaintiff to come to the top of the driveway. *Id*. Holding drew his service weapon and asked Plaintiff for his gun. *Id., p. 34.* Plaintiff explained it was on the hood of the white car next to where he had just been standing. *Id., p. 35.* Holding said he would have to detain Plaintiff to look for the gun. *Id.* Plaintiff allowed Holding to handcuff him, explaining in deposition that he had been detained in that manner in the neighborhood by police before and took no offense. *Id. pp. 35-37.* But Holding then started to take Plaintiff to his police car, so Plaintiff began to protest verbally. *Id. pp. 37-38.* Everyone agrees that Barber called out repeatedly, "this ain't right," used obscenities and tried to get someone's attention. *Id. p. 38.* After they got to Holding's car in the street, Defendant Wilson arrived as backup, *id. p. 39,* and told Plaintiff to calm down. *Id., p. 40.*

Wilson testified that Holding had Plaintiff in handcuffs and they were walking toward Holding's car when he arrived as backup. *Wilson, pp. 16-17.* He helped hold Plaintiff on the hood of Holding's car while Holding searched Plaintiff, finding the empty holster and the bullet clip on Plaintiff's hip. *Id. pp. 18-19.* Plaintiff says he injured his knee when being held against the car. The two officers then tried to put the protesting Plaintiff in the back seat of the police car, and Holding sucker punched the handcuffed Plaintiff in the stomach to get him to bend over and then get him into the car. *Plaintiff, pp. 40-41.* Holding then said something to Wilson about a gun, so Wilson stood by to monitor Plaintiff while Holding searched for the pistol. *Wilson, p. 22.* Holding looked through and around the Freestyle, came back to the police car and asked Plaintiff where his gun was located. *Plaintiff, p. 46.* Plaintiff told him again that the gun was on the hood of the other car and Holding found it there. *Id.* A third CMPD officer named Appiah had arrived; he took a picture of the gun where it was found on the hood of the car and Holding then put it in the trunk of his car. *Id. p. 46-47 ; Wilson, pp. 23-24.*

The officers then drove to the Nations Ford Elementary School parking lot nearby, with Plaintiff in the back seat of Holding's car. *Wilson, p. 40; Plaintiff, p. 48-49.* They parked three abreast and talked while Holding prepared the "pink sheet" – an arrest affidavit that police must swear to before a magistrate to obtain the warrantless arrest orders. *Wilson, p. 26.* Holding then took Plaintiff downtown. When Plaintiff got out of the car, he realized his knee was injured. *Plaintiff, p. 55*

Holding eventually wrote four separate accounts of about his encounter with Plaintiff and testified about it as well. *Holding*, *Ex. 1, 2, 3 and 5.* Holding wrote the arrest affidavit that night, *Holding Ex. 3,* and a "KBCOPS" computer generated incident report the next night, under an incident code 20081207-0037-03. *Holding Ex. 2. Holding, pp. 43-44.* That report contained a separate "public" statement about the incident. *Holding Ex. 1.* Finally, Holding also prepared an "Accused Employee Statement" about the arrest after Plaintiff complained to Holding's supervisors on January 6 that the arrest was illegal. *Holding Ex. 5.* Each account was distinctly different and, taken together, cannot be squared with CMPD dispatch records from the incident or CMPD's video technology.

The differences in these various statements are clearest when broken down into segments – the description of the pursuit and the description of the arrest.

The pursuit: In the Arrest Affidavit, Holding wrote that he got behind Plaintiff's vehicle after Plaintiff pulled out of "Dinaden Apartments" off Nations Ford, ran the car's license tag and received information that it was expired. *Holding Ex. 3, § 21.* Plaintiff increased his speed "upon noticing officer behind him," turned onto Short Hills Drive and sped away. *Id.*

In his KBCOPS report and "Accused Employee" statement, Holding wrote that Plaintiff was pulling out of Oak Park Apartments as Holding was pulling into them. They exchanged

6

glances and, in the KBCOPS report, Plaintiff gave Holding an "extremely odd look," *Holding Ex. 2, p. 6 of 8.* In the Accused Employee report, Plaintiff "became visibly nervous" and Holding knew that Plaintiff "was known to carry a fire arm and has been arrested for armed robbery in the past." *Holding Ex. 5, p. 0037.* Holding admitted, however, that he had no reason to suspect Plaintiff was carrying a concealed weapon when he saw him driving on Nations Ford. *Holding, p. 48-49.*

The tag supposedly came back as expired, though there is no written record of Holding making that check, and his report says the car was registered through 2009, so Holding did a u-turn in the parking lot and pursued Plaintiff. *Id.; also Holding Exhibit 5, Bates 0037.* Plaintiff supposedly responded by driving off at a high rate of speed and turned onto Short Hills Drive as Holding pulled out of the apartments onto Nations Ford. *Id.*

At deposition, Holding repeated the u-turn story, *Holding, pp. 28-29,* but now claimed that he turned on his blue lights briefly in pursuit of Plaintiff. *Id., pp. 28-29, 35- 36, 56-57.* He quickly turned the lights off for some reason when he turned down Short Hills Drive. *Id., pp. 29, 36.* The technology that CMPD officers use creates two records that undercut Holding's claim that he pursued a speeding Plaintiff with an expired tag.

 First, the dispatch call record generated by computer does not match Holding's rendition of events. *Respondent's Ex. 3* Holding contacted dispatch at 12:37:41 a.m. about a traffic stop. *Id.* He was located at 413 Short Hills Dr. –across the street from Plaintiff's house at 416 Short Hills Drive. *Id.* Fifteen seconds later, at 12:37:56, the dispatch enters Holding's report as "suspicious person/prowler" going "door to door." *Id.* Eight seconds later, at 12:38:03 a.m., the report is updated to "suspect on scene." Holding mentions none of these communications about

a suspected prowler in his reports.   Holding believed Plaintiff was a "robber" out prowling, not a person standing in his own driveway.

Twenty minutes later, at 12:57:20, the call record changes to "carry concealed weapon." That call record is completely consistent with Plaintiff's description of events – that Holding approached Plaintiff stealthily, called to Plaintiff to come up the driveway, drew his gun, handcuffed Plaintiff, took him to his car and charged him with CCW "off his own premises."

Second, the police department's video technology completely negates Holding's pursuit story.  If Holding had turned on his blue lights, even momentarily, as he claimed in deposition, it would have triggered his car's video recorder automatically.  Defendants produced in discovery the policy regarding use of the DMVR (digital mobile vehicle recorder), which became effective November 28, 2008, just before this incident. *Danchess, Ex. 19.*  Page 1 of 8 of the policy explains that this system continuously records but "the recording is not saved unless a trigger event occurs." *Id., part III. A.*   A "trigger event" as one "that causes the vehicle DMVR to begin saving video/audio recordings." *Id., part III. B.* Among the "trigger events" is activation of the "emergency lights." *Id.*  A trigger event saves the recording as well as up to 60 seconds of "pre-event recording." *Id., part III. C.*  The recording stops only when the officer manually selects "stop" on a drop down menu. *Id. Parts III. B and IV. 3.*   And recordings of a pursuit are kept for three years, *Id.  Chart at Part IV. 5.*

Holding conceded that using blue lights activated the recorder. *Holding pp. 56-57.* Wilson confirmed, stating that the prior recording system was also activated by use of blue lights. *Wilson, p. 14.*   Thus, if Holding turned on his blue lights, even briefly, there had to be *some* video of his pursuit of Plaintiff until he hit "stop", and it would include some record of his actions in the apartment parking lot before he hit his blue lights, .   There is none.

Plaintiff requested a copy of the video when he first tried to lodge a complaint over his arrest. A CMPD attorney, Laurie Oberbauer, wrote to Plaintiff on December 30, 2008 that "no DMVR tape was recorded of the incident that occurred on 12-07-08." *Holding Ex. 6.* The lack of any video recording proves that that Holding did not activate his blue lights in pursuit of the speeding Plaintiff. That fact, combined with the lack of any radio contact about a pursuit, shows that Holding's story is fictional.

The arrest: Holding also wrote different versions of the arrest. On the pink sheet, Holding wrote, incredibly, that *multiple officers* pursued and caught up with Plaintiff as he got out of his vehicle in the driveway and drew *multiple weapons* when Plaintiff refused to get back in his vehicle and, while surrounded by officers holding weapons, reached under his shirt and pulled "a handgun from his waist band and laid it on his car." *Holding Ex. 3.* The "officers could not see that the object was a weapon" however. *Id.* Plaintiff then cursed, resisted being handcuffed and taken to the car and had to be "helped" into the car. *Id.*

In the KBCOPS report the next day, Holding wrote that he acted alone and saw Plaintiff "turn away from me and reach down in what appeared to be his pants and walk over to a park(ed) car. *Holding Ex. 2, p. 6 of 8.* Holding pulled his gun on Plaintiff in repsonse, who put his hands in the air. *Id.* Holding put his gun away, placed Plaintiff's hands behind his back and frisked him. *Id.* He claimed that Plaintiff then resisted being handcuffed and Wilson had to help escort Plaintiff to Holding's car. *Id.* Wilson said that they were at the car when he arrived. The two officers "assisted" Plaintiff into the car and Holding then located the gun on the hood of the car next to which Plaintiff had been standing.

9

Holding also prepared the public release version, stating that that he saw Plaintiff driving at an excessive speed on Nation Ford, Plaintiff tried to elude him by walking away, and was found "in possession of a concealed weapon."  *Holding Ex. 1.*

In the "Accused Employee" statement prepared in January, Holding wrote that Plaintiff stated he was "at home" when Holding approached him in the driveway  *Holding Ex. 5.* Plaintiff then walked behind parked vehicles in the driveway, bent down and reached for his right hip.  *Id.*  Holding pulled his gun and Plaintiff raised his hands and walked towards Holding. Holding got Plaintiff's hands behind his back and placed him on the same hood of the parked car where he later found the gun.  *Id.*  Holding could not explain how the gun got from the back of the car to the hood if Plaintiff had his hands raised while walking from back to front.  He wrote that Wilson arrived while Holding had Plaintiff on the hood of a car in the driveway, a fact Wilson contradicts.  *Id.* As Plaintiff's family came out to see the commotion, the officers moved Plaintiff from that car to the police car.  Holding held the top of Barber's head with his left hand and "with my right hand pushed Mr. Barber in his sternum until he folded up" to get him in the police car.  *Id.*   Plaintiff described this as Holding sucker punched him.

Holding learned at some point that Plaintiff was at his home, where he could conceal a weapon.  The misdemeanor warrants listed 416 Short Hills Drive as Plaintiff's address.  *Holding Ex. 9, 10.*  And, all but the public release version of event reported that Holding found the gun on the hood of a car, not on Plaintiff.   He nonetheless arrested Plaintiff for CCW "off at that address, as well as resisting an officer and reckless driving.

Plaintiff spent several days in jail. After his release, he sought medical care for his injured knee, *Plaintiff, pp. 61-63.*  His first court date was January 9 for the CCW charge.  *Id. p. 57.*  Plaintiff contacted the CMPD on December 22, 2008 to request the video tape of the

incident and received the letter, dated December 30, stating there was none.  *Holding Ex. 6.*  He

then met with Defendant Sgt. Malone and Sgt. Hildebran on January 6.  *Plaintiff, pp. 96-97;*

*Holding Ex. 7 (letter of February 11, 2009 refers to complaint filed on January 6.)*  The

sergeants laughed at Plaintiff's complaint, *Plaintiff, p. 97,* but Malone got hostile and took notes

when Plaintiff told him he had a witness.  *Id. pp. 97-98.*

Malone asked Holding to prepare the "Accused Employee" statement, *Holding Ex. 5,* and

Wilson to prepare a statement that was entered as a supplement to Holding's KBCOPS report,

*Wilson, Ex. 25,* and Malone then prepared his own report, in which he derided Plaintiff for

complaining about his report and not being honest.  See, *Danchess Dep., p. 18 (Malone*

*prepared the supervisor's report); Danchess Ex. 20 Supervisor's Synopsis, stating at Bates page*

*0034, second ¶, (*"I then spoke with Officer Holding and Officer Wilson and asked them to write

a detailed statement . . .*")*

That same day, with Malone's approval, Holding obtained a felony warrant against

Plaintiff, based on the prior 2007 CCW conviction.[2]  *Plaintiff's Ex. 2.*  Holding knew about the

prior conviction before or right after the December 7, 2008 arrest, *Holding, pp. 27, 58-59,* so the

felony charge was not based on new information.  Instead, Malone told Holding of Plaintiff's

January 6th complaint, asked for an "accused employee" statement and then approved the felony

charge.  *Id., pp. 62-63.*   Holding discussed obtaining the felony warrant with Malone in this

process  *Id., p. 72-73.*

The warrant issued two days later on January 8, the day before Plaintiff's misdemeanor

court date.  Malone supervised the arrest at Plaintiff's home.  *Holding, p. 71; Wilson, p. 32-33;*

---

[2]   A second or subsequent offense is punishable as a Class I felony.  N.C. Gen. Stat. Ann. § 14-269(c).

*Plaintiff, p. 65.* Wilson recalled Malone talking with someone at the front door before they arrested Plaintiff. *Wilson, p. 33.* Plaintiff had been in bed and came downstairs with only shorts on. *Plaintiff, p. 68.* He asked to see the warrant. *Id. p. 66-68.* The officer did not have a copy of the warrant to show Plaintiff, but when he declined to step outside, the phalanx of officers rushed into the house with guns pointed at Plaintiff's family members. *Id. p. 67.*

Plaintiff remained in jail until his new bond was unsecured about two weeks later. *Id. p. 71.* The grand jury indicted Plaintiff on January 26. *Holding Ex. 11.* The State's witness before the grand jury was an officer named Maxfield who lacked any personal knowledge of the facts. *Id., Holding Dep. pp. 18, 80-81.*

Plaintiff appealed his arrest internally to the Chief and Citizens Review Board without success. *Holding Ex. 7, Danchess Ex. 23, 24.*

He also started a parade of court appearances. Reading from the bottom of Defendants' Summary Judgment Exhibit 2, the Court can see the sequence of court dates. On January 30, 2009, the case was continued to April 28, 2009. *Id.* On April 28, it was continued to May 27, 2009. *Id.* On May 27, it was initially reset for November 2, 2009, but then changed to July 27. *Id.* Then, on July 27, 2009, it was continued to August 31. *Id.*

The entries that are bewildering. On August 25, 2009, the trial date was reset backwards to August 24. *Id.* An order for Plaintiff's arrest or "OFA" was issued on August 25 for Plaintiff failing to appear in court on August 24, though there was no entry prior to August 25 showing that August 24 court date. *Id.; Holding Ex. 14.* Plaintiff had no notice that he had to appear on that date. After the OFA issued, the court date was then reset once again on August 25 – now from August 24, 2009 back to August 31, 2009, the original court date.

12

Plaintiff was arrested that night, August 25, at the convenience store at 9001 Nations Ford Road where Wilson had seen and asked about the gun in November 2008 . *Plaintiff, p. 79.* His secured bond was set at $10,000. *Holding Ex. 14.* The bond was finally reduced to $1500 on October 7. *Respondent's Ex. 4.* Plaintiff posted bond got out of jail on October 9. *Id. p. 82.*

Plaintiff was given a new court date in January 2010. When he arrived in court, he learned his charge had been dismissed in November. *Plaintiff, p. 82.* He obtained a copy of the dismissal, signed by the District Attorneys' office on November 20, 2009 and filed on November 23. *Holding Ex. 16.* The prosecutor wrote that there was insufficient evidence of concealment, in that the gun was found on the hood of a car; and, Plaintiff was arrested in the driveway of his home *Id.*

## ISSUES FOR TRIAL

### A. Defendants Are Liable for Plaintiff's Imprisonment.

Plaintiff's initial arrest was unlawful. The felony enhancement was thus, also unlawful, and was the source of Plaintiff's imprisonment after January 8, 2009. Further, that felony enhancement was taken out in retaliation for Plaintiff's complaint to police supervisors that his arrest was unlawful – a complaint protected by the First Amendment. Defendants are liable, then, due to the complete lack of probable cause for all charges, and for First Amendment retaliation. The issuance of facially valid felony warrants and an indictment does not shield Defendants from the complete lack of probable cause and retaliatory motive for the felony CCW charge. In short, the evidence satisfies the elements of malicious prosecution and for First Amendment retaliation, and damages for any imprisonment or other adverse consequences are available.

> The common-law cause of action for malicious prosecution . . . .permits damages for confinement imposed pursuant to legal process. 'If there is a false arrest claim,

> damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.' W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 888 (5th ed. 1984). But a successful malicious prosecution plaintiff may recover, in addition to general damages, "compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society." *Id.,* at 887–888 (footnotes omitted).

*Heck v. Humphrey,* 512 U.S. 477, 484, 114 S. Ct. 2364, 2371, 129 L. Ed. 2d 383 (1994).   The related claims of false arrest, malicious prosecution and First Amendment retaliation combine here to make Defendants liable for all of the time Plaintiff spent in jail plus his other injuries.

1. **False Arrest.**

Holding arrested Plaintiff without a warrant.  A warrantless arrest without probable cause is unlawful and actionable as false arrest.  *Fowler v. Valencourt,* 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993).  *State v. Zuniga,* 312 N.C. 251, 259, 322 S.E.2d 140, 145 (1984); *Glenn-Robinson v. Acker,* 140 N.C.App. 606, 538 S.E.2d 601 (2000); *Myrick v. Cooley,* 91 N.C.App. 209, 212, 371 S.E.2d 492, 494, *disc. review denied,* 323 N.C. 477, 373 S.E.2d 865 (1988)). *Marlowe v. Piner* , 119 N.C.App. 125, 458 S.E.2d 220 (1995).  **The arresting officer has the burden of proving the existence of probable cause.**  *Sigmon v. Shell*, 165 N.C. 582, 81 S.E. 739 (1914); *Redding v. Shelton's Harley Davidson, Inc*., 139 N.C.App. 816, 819, 534 S.E.2d 656, 658 (2000).  And, where the material facts are undisputed -- and they are here as to whether Plaintiff was at his home when arrested for carrying a concealed weapon, the existence of probable cause is a pure question of law.  *Pitts v. Village Inn Pizza, Inc.,* 296 N.C. 81, 87, 249 S.E.2d 375, 379 (1978); *Moore v. Evans,* 124 N.C. App. 35, 43, 476 S.E.2d 415, 422 (1996).

Holding cannot meet his burden of showing probable cause for the arrest on any of the charges.   The District Attorney dismissed the CCW charge because Plaintiff was at his own home when he was arrested – an absolute statutory exception to the charge.  There was no

14

suspicion or proof at the time of arrest that the gun was concealed at any time off the premises. Holding concedes he had no suspicion of concealment when he saw Plaintiff driving. Further, Holding did not find the gun on Plaintiff, but on the hood of a car in the driveway. He fashioned different stories of Plaintiff reaching in his pants for the gun, but all of that conduct occurred in the driveway – on Plaintiff's premises. Holding cannot meet his burden of proving probable cause for charging Plaintiff for CCW.

There is also no evidence of reckless driving. Holding's claim that he turned on his blue lights in pursuit of a speeding Plaintiff is completely false – he concedes there would be a video recording. Holding cannot meet his burden of proving probable cause existed to charge Plaintiff with reckless driving.

Holding also cannot show he had probable cause to charge Plaintiff with resist, delay and obstruct. Plaintiff had a right to resist an unlawful arrest. *State v. Mobley,* 240 N.C. 476, 478, 83 S.E.2d 100, 102 (1954). In *Roberts v. Swain,* 126 N.C. App. 712, 723, 487 S.E.2d 760, 768 (1997), the state court of appeals relied on *Mobley* to find that a person being arrested without probable cause had a right to resist such an arrest, and even to use reasonable force. Here, Plaintiff did not fight with the Holding or Wilson, he protested verbally. Plaintiff could not be charged for protesting his unlawful arrest. See, *State v. Allen,* 14 N.C. App. 485, 491, 188 S.E.2d 568, 572-73 (1972)("remonstrating with officer is not unlawful). See, also, *Norwell v. City of Cincinnati, Ohio,* 414 U.S. 14, 16, 94 S. Ct. 187, 188, 38 L. Ed. 2d 170 (1973).

Thus, Holding cannot meet his burden of proving probable cause for the initial arrest on any of the three charges. This Court can enter summary judgment against Holding on this claim based upon the facts in the record.

b.    **Defendants violated G.S. § 15A-401(e)(1)**

Separately, Holding and Malone are liable for false arrest under state law for failing to present the warrant when entering the home to arrest of January 8. Though they had obtained a warrant, they did not present it to Plaintiff when asked, but forcibly entered the home instead to arrest Plaintiff. North Carolina law specifically requires an officer to present an arrest warrant before entering a private home to make an arrest. See, N.C.G.S. § 15A-401(e)(1). See, *State v. Hewson*, 88 N.C. App. 128, 131, 362 S.E.2d 574, 576 (1987)(violation of §15A-401(e)(1) to enter house without warrant in officer's possession). Here, Defendants are not shielded from a false arrest claim by the existence of a warrant when they failed to possess or produce the warrant as required by law.

This Court should enter summary judgment for Plaintiff on that particular false arrest claim, as the facts are undisputed and the law is clear.

**2. Assault**

Plaintiff complains that he injured his knee when forced against the hood of Holding's car and that Holding punched him in the stomach to fold Plaintiff into the backseat of his car. Force that is unreasonable or excessive under the circumstances is actionable as assault. *Kuykendall v Turner,* 61 N.C.App. 638, 301 S.E.2d 715 (1983); *Todd v. Creech,* 23 N.C. App. 537, 209 S.E.2d 293, *cert. denied,* 286 N.C. 341, 21 S.E.2d 216 (1974). It also violates G.S. § 15A-401(b).

Regardless of whether that level of force was excessive, any use of force constitutes assault if the arrest is unlawful. *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 623, 538 S.E.2d 601, 614 (2000). See also, *Fowler v. Valencourt,* 334 S.E.2d 345, 435 S.E.2d 530 (1993), *Mobley, supra; Myrick v. Cooley, supra; State v. Simmons,* 192 N.C. 692, 695, 135 S.E. 866,

16

867 (1926).  If Holding lacked probable cause to arrest Plaintiff, Holding can individually and officially liable for assault

3. **Malicious Prosecution**

Defendants obtained a warrant for Plaintiff's arrest on January 8 on the charge of felony CCW.   Plaintiff can make a claim for malicious prosecution on this charge by showing that (1) Defendants initiated the criminal charges against him, (2) they did so with implied or actual malice, (3) without probable cause, and (4) the charges were terminated in Plaintiff's favor.  *Best v. Duke University,* 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994); *Nguyen v. Burgerbusters, Inc.,* 182 N.C.App. 447, 452, 642 S.E.2d 502, 507 (2007).

Initiation of charges: Holding and Malone initiated the felony CCW charge.  Holding's name is on the warrant, and Malone conferred with and approved of Holding obtaining the warrant the same day that he wrote the scathing Supervisor's Synopsis of Plaintiff's citizen's complaint.  Malone then supervised the arrest same evening

Malice:  Defendant's acted with legal and actual malice.   The only explanation for seeking the felony charge on January 8 was retaliation for Plaintiff complaining about his arrest. Holding knew of the prior CCW charge before he arrested Plaintiff on December 8.  He did not suddenly realize on January 8 that grounds for a felony charge existed.

 Lack of probable cause:  Defendants lacked probable cause to charge Plaintiff with CCW from locating a handgun on a car in his own driveway.   Defendants cannot show otherwise. Those material facts are not in dispute, so the existence of probable cause is a pure question of law.  *Pitts v. Village Inn Pizza, Inc., supra*; *Moore v. Evans*, *supra*.

Termination in Plaintiff's favor: The prosecutor dismisses the charges and explicitly described the absence of probable cause for the offense – Plaintiff was at his home and the gun was not concealed. *Jones v. Gwynne,* 312 N.C. 393, 400, 323 S.E.2d 9, 13 (1984).

Plaintiff has substantial evidence supporting all four elements of the claim.

**Obstruction of Justice**

Plaintiff must show some conduct "which prevents, obstructs, impedes or hinders public or legal justice." *Grant v. High Point Reg'l Health Sys.*, 184 N.C. App. 250, 253-257 (N.C. Ct. App. 2007). As *Grant* noted, the common law claim requires only a showing of an "attempt" to obstruct, not proof of success in doing so. 184 N.C. App. at 253, 645 S.E.2d at 853, citing to *Henry v. Deen,* 310 N.C. 75, , 310 S.E.2d 326, 330 (1984). Here, Holding's initial arrest affidavit clearly attempts to impeded public justice, falsely claiming that multiple officers pursued Plaintiff and pulled weapons on him when he reached into his waist to pull out a gun. That rendition of events was baldly false and a brazen attempt to hide the actual facts of the case.

Similarly, Plaintiff alleges that Wilson filed a false report with his supplemental report of January 8, 2009, failing to disclose that Holding punched Plaintiff in the stomach to double him over to get into the car. Given that Holding admitted to pushing Plaintiff's sternum to "assist" him into the car, there is evidence from which a jury could find that Wilson deliberately omitted information from his report.

Defendants argue that because a warrant was issued for the January and August arrests, Plaintiff cannot bring a claim for obstruction of justice. The felony indictment was issued inb response to Plaintiff complaining about his arrest. The indictment was obtained by an officer who was not involved in Plaintiff's arrest, who relied solely on information to from Holding,

Wilson and Malone, and who charged Plaintiff with felony concealment of a weapon off his premises.

4. **Violation of the Fourth Amendment**

The absence of probable cause to arrest Plaintiff in December 2008, as explained in the discussion of the state law claims, *infra*, establishes a Fourth Amendment violation.   The absence of probable cause makes an arrest an unreasonable seizure.   See, *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (quoting *United States v. Garcia*, 848 F.2d 58, 59-60 (4th Cir. 1988), *cert. denied*, 488 U.S. 957 (1988)); *Street v. Surdyka*, 492 F2d 368, 372-73(4th Cir. 1974).

And the issuance of a warrant does not resolve the Fourth Amendment claim.  The Courts recognize a Fourth Amendment claim for malicious prosecution when that prosecution is initiated without probable cause and terminated in Plaintiff's favor.  See,  *Brooks v. City of Winston-Salem,*  85 F.3d 178, 183 (4th Cir. 1996).   That claim, analogous to the state law malicious prosecution claim, is fully supported by this record.

***Monell* liability:** Defendants argue separately that the City and Chief Monroe in his official capacity cannot be liable for any Fourth Amendment violation absent proof the action was taken pursuant to a policy or custom.   Plaintiff argues that the City and Chief Monroe ratified the actions of the officers.  Plaintiff grieved his arrest up the chain of command to Chief Monroe and beyond him to the Citizen's Review Board.  *Danchess Ex. 23.* The Chief ratified the arrest and exonerated Holding.  *Plaintiff's Ex. 2.*  So did the Review Board. *Danchess Ex. 24.*  A citizen can appeal no further within City government to challenge a law enforcement decision. That ratification of Holding's actions by the City's final policymakers on law enforcement policy – the Chief and the Citizen's Review Board, subjects the City to liability.

19

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926, 99 L. Ed. 2d 107 (1988).

Plaintiff's claim against the Chief and the City are predicated on ratification of Holding's conduct, not on the existence of some unconstitutional policy or practice.

### 5. Defendants Violated the First Amendment

The decision to charge and arrest Plaintiff for felony CCW in retaliation for a citizen complaint about an unlawful arrest violate the First Amendment.

> [T]o demonstrate a First Amendment retaliation claim under § 1983 a plaintiff must show "(1) constitutionally protected conduct, (2) an adverse action by [ ] officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his [constitutional] rights and the adverse action taken against him." *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir.2003) (internal punctuation omitted). As our Court of Appeals has noted, "[t]he Supreme Court has clearly held that prosecution of a citizen in retaliation 'for nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech," *Losch v. Borough of Parksburg, Pa.,* 736 F.2d 903, 910 (3d Cir.1984) (quoting *Norwell v. City of Cincinnati,* 414 U.S. 14, 16, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973)).

*Burke v. Twp. of Cheltenham,* 742 F. Supp. 2d 660, 673-74 (E.D. Pa. 2010).

Defendants do not contest these legal principal, stating that Plaintiff must prove a causal connection between the protected speech and felony charge.   Plaintiff's evidence of retaliatory conduct includes more than 48-hour temporal proximity.  The evidence includes the contemptuous tone and content of Malone's Supervisor Synopsis of Plaintiff's internal complaint, the title of Holding's statement (the "Accused Employee") and the quick arrest and show of force at Plaintiff's house the same evening the warrant issued.

Finally, Defendants cannot show any other motive for this decision, a Holding had known of the prior CCW charge when he arrested Plaintiff.

**6. Plaintiff Did Not Willfully Miss His Court Date**

Defendants argue that they cannot be responsible for Plaintiff's incarceration for missing Court on August 24. That is erroneous for two reasons.

First, Plaintiff's incarceration would not have occurred but for that charge. Given the lack of probable cause and retaliatory motive behind the felony charge, any time incarcerated is attributable to the felony charge. Defendants are liable for the damages that flow from it.

Second, Plaintiff did not "willfully" fail to appear at his court date. Defendant cannot show any prior notice to Plaintiff of the August 24 court date that he missed. The *only* evidence in the record is the court document showing that Plaintiff August 24, 2009 court date was set retroactively on August 25, 2009. There is no record anywhere known to Plaintiff or his counsel or any prior notice of this August 24 court date.

Third, even if Plaintiff were negligent in missing the August 24 court date, contributory negligence is not available as a defense to the intentional torts alleged here.

<b>CONCLUSION</b>

Plaintiff believes the trial will result in the admission of substantial evidence in support of all of his claims and the case will be submitted to the jury.

Respectfully submitted this 23d day of January, 2013.

**s/ S. Luke Largess**
S. Luke Largess (N.C. Bar #17486)
Tin, Fulton, Walker, & Owen PLLC
301 E Park. Ave
Charlotte, NC  28203
704-338-1220
llargess@tinfulton.com

Attorney for the Plaintiff

22

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Trial Brief was served upon Defendants' attorneys of record, through the ECF system, addressed to:

R. Harcourt Fulton
City Attorney's Office
600 East Fourth St.
Charlotte, NC 28202-2841
*cfulton@ci.charlotte.nc.us*

Respectfully submitted, this the 23rd day of January, 2013.


**s/ S. Luke Largess**
S. Luke Largess